HUMPHREY ET AL. *v.* MOORE ET AL.

No. 17.   Argued October 16, 1963.—Decided January 6, 1964.*

---

*Together with No. 18, *General Drivers, Warehousemen & Helpers, Local Union No. 89,* v. *Moore et al.,* also on certiorari to the same Court.

*David Previant* and *Mozart G. Ratner* argued the cause for petitioners. With them on the briefs were *H. Solomon Horen, William S. Zeman, Herbert S. Thatcher* and *Ralph H. Logan.*

*John Y. Brown* and *Newell N. Fowler* argued the cause and filed briefs for respondents.

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue here is whether the Kentucky Court of Appeals properly enjoined implementation of the decision of a joint employer-employee committee purporting to settle certain grievances in accordance with the terms of a collective bargaining contract. The decision of the committee determined the relative seniority rights of the employees of two companies, Dealers Transport Company of Memphis, Tennessee, and E & L Transport Company of Detroit, Michigan. We are of the opinion that the Kentucky court erred and we reverse its judgment.

Part of the business of each of these companies was the transportation of new automobiles from the assembly plant of the Ford Motor Company in Louisville, Kentucky. In the face of declining business resulting from several factors, the two companies were informed by Ford that there was room for only one of them in the Louisville operation. After considering the matter for some time, the two companies made these arrangements: E & L would sell to Dealers its "secondary" authority out of Louisville, the purchase price to be a nominal sum roughly equal to the cost of effecting the transfer of authority; E & L would also sell to Dealers its authority

to serve certain points in Mississippi and Louisiana; and Dealers would sell to E & L its initial authority out of Lorain, Ohio, along with certain equipment and terminal facilities. The purpose of these arrangements was to concentrate the transportation activities of E & L in the more northerly area and those of Dealers in the southern zone. The transfers were subject to the approval of regulatory agencies.

The employees of both Dealers and E & L were represented by the same union, General Drivers, Warehousemen and Helpers, Local Union No. 89. Its president, Paul Priddy, as the result of inquiry from E & L by his assistant, understood that the transaction between the companies involved no trades, sales, or exchanges of properties but only a withdrawal by E & L at the direction of the Ford Motor Company. He consequently advised the E & L employees that their situation was precarious. When layoffs at E & L began three E & L employees filed grievances claiming that the seniority lists of Dealers and E & L should be "sandwiched" and the E & L employees be taken on at Dealers with the seniority they had enjoyed at E & L. The grievances were placed before the local joint committee, Priddy or his assistant meanwhile advising Dealers employees that they had "nothing to worry about" since E & L employees had no contract right to transfer under these circumstances.

The collective bargaining contract involved covered a multi-employer, multi-local union unit negotiated on behalf of the employers by Automobile Transporters Labor Division and on behalf of the unions by National Truckaway and Driveaway Conference. Almost identical contracts were executed by each company in the unit and by the appropriate local union. According to Art. 4, § 1 of the contract "seniority rights for employees shall prevail" and "any controversy over the employees' standing

on such lists shall be submitted to the joint grievance procedure. . . ." Section 5 of the same article, of central significance here, was as follows:

> "In the event that the Employer absorbs the business of another private, contract or common carrier, or is a party to a merger of lines, the seniority of the employees absorbed or affected thereby shall be determined by mutual agreement between the Employer and the Unions involved. Any controversy with respect to such matter shall be submitted to the joint grievance procedure."

Article 7 called for grievances to be first taken up between the employer and the local union and, if not settled, to be submitted to the local joint committee where the union and the employer were to have equal votes. Failing settlement by majority vote of the members of the local committee, the matter could be taken to the Automobile Transporters Joint Conference Committee upon which the employers and the unions in the overall bargaining unit had an equal number of representatives. Decisions of the Joint Conference Committee were to be "final and conclusive and binding upon the employer and the union, and the employees involved." However, if the Joint Conference Committee was unable to reach a decision the matter was to be submitted to arbitration as provided in the contract.

Article 7 also provided that:

> (d) "It is agreed that all matters pertaining to the interpretation of any provision of this Agreement, whether requested by the Employer or the Union, must be submitted to the full Committee of the Automobile Transporters Joint Conference Committee, which Committee, after listening to testimony on both sides, shall make a decision."

Other provisions of the contract stated that it was "the intention of the parties to resolve all questions of interpretation by mutual agreement" and that the employer agreed "to be bound by all of the terms and provisions of this Agreement, and also agrees to be bound by the interpretations and enforcement of the Agreement."

The grievances of the E & L employees were submitted directly to the local joint committee and endorsed "Deadlocked to Detroit for interpretation" over the signatures of the local union president and the Dealers representative on the committee. Later, however, the local union, having been more fully advised as to the nature of the transaction between the two companies, decided to recommend to the Joint Conference Committee that the seniority lists of the two companies be dovetailed and the E & L employees be employed at Dealers with seniority rights based upon those which they had enjoyed at E & L. The three shop stewards who represented the Dealers employees before the Joint Conference Committee meeting in Detroit were so advised by the union immediately prior to the opening of the hearing. After hearing from the company, the union and the stewards representing Dealers employees, the Joint Conference Committee thereupon determined that "in accordance with Article 4 and particularly sub-sections 4 and 5" of the agreement the employees of E & L and of Dealers should "be sandwiched in on master seniority boards using the presently constituted seniority lists and the dates contained therein . . . ."

Since E & L was an older company and most of its employees had more seniority than the Dealers employees, the decision entailed the layoff of a large number of Dealers employees to provide openings for the E & L drivers.

Respondent Moore, on behalf of himself and other Dealers employees, then brought this class action in a Kentucky state court praying for an injunction against the union and the company to prevent the decision of the Joint Conference Committee from being carried out. Damages were asked in an alternative count and certain E & L employees were added as defendants by amendment to the complaint.[1] The complaint alleged that Dealers employees had relied upon the union to represent them, that the president of Local 89, Paul Priddy, assured Dealers employees that they had nothing to worry about and that precedent in the industry provided that when a new business is taken over, its employees do not displace the original employees of the acquiring company; it further alleged that Priddy had deliberately "deadlocked" the local joint committee and that the Dealers employees learned for the first time before the Joint Conference Committee in Detroit, that Priddy favored dovetailing the seniority lists. Priddy's actions, the complaint went on, "in deceiving these plaintiffs as to his position left them without representation before the Joint Conference Committee." The decision, according to the complaint, was "contrived, planned and brought about by Paul Priddy" who "has deceived and failed completely to represent said employees" and whose "false and deceitful action" and "connivance . . . with the employees of E & L" threatened the jobs of Dealers employees. The International union is said to have "conspired with and assisted the defendant, Local No. 89, and its president, Paul Priddy, in bringing about this result . . . ." The decision of the Joint Conference Committee was charged to be arbitrary and capricious, contrary to the existing practice in the industry and violative of the collective bargaining contract.

---

[1] The International union was also named as a party but service was quashed and the action dismissed as against it.

After hearing, the trial court denied a temporary and permanent injunction.[2] The Court of Appeals of the Commonwealth of Kentucky reversed and granted a permanent injunction, two judges dissenting. 356 S. W. 2d 241. In the view of that court, Art. 4, § 5 could have no application to the circumstances of this case since it came into play only if the absorbing company agreed to hire the employees of the absorbed company. The clause was said to deal with seniority, not with initial employment. Therefore, it was said, the decision of the Joint Conference Committee was not binding because the question of employing E & L drivers was not "arbitrable" at all under this section. The Court of Appeals, however, went on to hold that even if it were otherwise, the decision could not stand since the situation involved antagonistic interests of two sets of employees represented by the same union advocate. The result was inadequate representation of the Dealers employees in a context where Dealers itself was essentially neutral. Against such a backdrop, the erroneous decision of the board became "arbitrary and violative of natural justice." Kentucky cases were cited and relied upon. We granted both the petition filed by the E & L employees in No. 17 and the petition in No. 18, filed by the local union. 371 U. S. 966, 967.

## I.

Since issues concerning the jurisdiction of the courts and the governing law are involved, it is well at the outset to elaborate upon the statement of the Kentucky court that this is an action to enforce a collective bargaining contract, an accurate observation as far as we are concerned.

---

[2] The denial of a temporary injunction by the trial court was set aside and temporary injunction ordered by the Court of Appeals. Thereafter the trial court dismissed the complaint, but the Court of Appeals reversed and made the temporary injunction permanent.

First, Moore challenges the power of the parties and of the Joint Conference Committee to dovetail seniority lists of the two companies because there was no absorption here within the meaning of § 5 of Art. 4 and because, as the court below held, that section granted no authority to deal with jobs as well as seniority. His position is that neither the parties nor the committee has any power beyond that delegated to them by the precise terms of § 5. Since in his view the Joint Committee exceeded its power in making the decision it did, the settlement is said to be a nullity and his impending discharge a breach of contract.

Second, Moore claims the decision of the Committee was obtained by dishonest union conduct in breach of its duty of fair representation and that a decision so obtained cannot be relied upon as a valid excuse for his discharge under the contract. The undoubted broad authority of the union as exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation. *Syres* v. *Oil Workers Union*, 350 U. S. 892, reversing 223 F. 2d 739; *Brotherhood of Railroad Trainmen* v. *Howard*, 343 U. S. 768; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen*, 323 U. S. 210; *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192. "By its selection as bargaining representative, it has become the agent of all the employees, charged with the responsibility of representing their interests fairly and impartially." *Wallace Corp.* v. *Labor Board*, 323 U. S. 248, 255. The exclusive agent's obligation "to represent all members of an appropriate unit requires [it] to make an honest effort to serve the interests of all of those members, without hostility to any . . ." and its powers are "subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Ford Motor Co.* v. *Huffman*, 345 U. S. 330, 337–338.

In the complaint which Moore filed here, the union is said to have deceived the Dealers employees concerning their job and seniority rights, deceitfully connived with the E & L drivers and with the International union to deprive Moore and others of their employment rights and prevented the latter from having a fair hearing before the Joint Committee by espousing the cause of the rival group of drivers after having indicated that the interests of the men at Dealers would be protected by the union. These allegations are sufficient to charge a breach of duty by the union in the process of settling the grievances at issue under the collective bargaining agreement.

Both the local and international unions are charged with dishonesty, and one-half of the votes on the Joint Committee were cast by representatives of unions affiliated with the international. No fraud is charged against the employer; but except for the improper action of the union, which is said to have dominated and brought about the decision, it is alleged that Dealers would have agreed to retain its own employees. The fair inference from the complaint is that the employer considered the dispute a matter for the union to decide. Moreover, the award had not been implemented at the time of the filing of the complaint, which put Dealers on notice that the union was charged with dishonesty and a breach of duty in procuring the decision of the Joint Committee. In these circumstances, the allegations of the complaint, if proved, would effectively undermine the decision of the Joint Committee as a valid basis for Moore's discharge.[3]

For these reasons this action is one arising under § 301 of the Labor Management Relations Act[4] and is

---

[3] In its brief filed here Dealers does not support the decision of the Joint Committee. It suggests, rather, that the matter be finally settled by arbitration under the terms of the contract.

[4] Section 301 (a) of the L. M. R. A. is as follows:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting com-

a case controlled by federal law, *Textile Workers Union v. Lincoln Mills,* 353 U. S. 448, even though brought in the state court. *Local 174, Teamsters v. Lucas Flour Co.,* 369 U. S. 95; *Smith v. Evening News Assn.,* 371 U. S. 195. Although there are differing views on whether a violation of the duty of fair representation is an unfair labor practice under the Labor Management Relations Act,[5] it is not necessary for us to resolve that difference here. Even if it is, or arguably may be, an unfair labor practice, the complaint here alleged that Moore's discharge would violate the contract and was therefore within the cognizance of federal and state courts, *Smith v. Evening News Assn., supra,* subject, of course, to the applicable federal law.[6]

We now come to the merits of this case.

merce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U. S. C. § 185 (a).

[5] Compare, for example, *Labor Board v. Local 294, International Bro. of Teamsters,* 317 F. 2d 746 (C. A. 2d Cir.), with *Miranda Fuel Co.,* 140 N. L. R. B. 181 (1962); enforcement denied, *Labor Board v. Miranda Fuel Co.,* 326 F. 2d 172 (C. A. 2d Cir.). See also Cox, The Duty of Fair Representation, 2 Villanova L. Rev. 151, 172–175.

[6] The union contended in the state courts that the jurisdiction of the state courts had been preempted by the federal statutes. The Kentucky Court of Appeals ruled otherwise and the union appears to have abandoned the view here, since it says, relying upon *Ford Motor Co. v. Huffman,* 345 U. S. 330, that individual employees "may undoubtedly maintain suits against their representative when the latter hostilely discriminates against them."

We note that in *Syres v. Oil Workers International Union.* 350 U. S. 892, individual employees sued the exclusive agent and the company to enjoin and declare void a collective bargaining agreement alleged to violate the duty of fair representation. Dismissal in the trial court was affirmed in the Court of Appeals. This Court reversed and ordered further proceedings in the trial court in the face

## II.

If we assume with Moore and the courts below that the Joint Conference Committee's power was circumscribed by § 5 [7] and that its interpretation of the section is open to court review, Moore's cause is not measurably advanced. For in our opinion the section reasonably meant what the Joint Committee said or assumed it meant. There was an absorption here within the meaning of the section and that section did deal with jobs as well as with seniority.[8]

---

of contentions made both in this Court and the lower courts that the employees should have brought their proceedings before the National Labor Relations Board. Cf. *Cosmark* v. *Struthers Wells Corp.*, 54 L. R. R. M. 2333 (Pa. Oct. 17, 1963).

The E & L employees, petitioners in No. 17, urge that even if the federal courts may entertain suits such as this, the state courts may not. Since in our view the complaint here charged a breach of contract, we find no merit in this position. It is clear that suits for violation of contracts between an employer and a labor organization may be brought in either state or federal courts. *Dowd Box Co.* v. *Courtney*, 368 U. S. 502.

[7] We need not consider the problem posed if § 5 had been omitted from the contract or if the parties had acted to amend the provision. The fact is that they purported to proceed under the section. They deadlocked at the local level and it was pursuant to § 5 that the matter was taken to the Joint Conference Committee which, under Art. 7, was to make a decision "after listening to testimony on both sides." The committee expressly recited that its decision was in accordance with § 5 of the contract. Even in the absence of § 5, however, it would be necessary to deal with the alleged breach of the union's duty of fair representation.

[8] We also put aside the union's contention that Art. 7, § (d)— providing that all matters of interpretation of the agreement be submitted to the Joint Conference Committee—makes it inescapably clear that the committee had the power to decide that the transfer of operating authority was an absorption within the scope of § 5. But it is by no means clear that this provision in Art. 7 was intended to apply to interpretations of § 5, for the latter section by its own terms appears to limit the authority of the committee to disputes over

Prior to this transaction both E & L and Dealers were transporting new cars out of Louisville for the Ford Motor Company. Afterwards, only one company enjoyed this business, and clearly this was no unilateral withdrawal by E & L. There was an agreement between the companies, preceded by long negotiation. E & L's authority to engage in the transportation of new cars out of Louisville was sold to Dealers. The business which E & L had done in that city was henceforth to be done by Dealers. While there was no sale of tangible assets at that location, the Joint Conference Committee reasonably concluded that there was an absorption by Dealers of the E & L business within the meaning of § 5 of the contract.

It was also permissible to conclude that § 5 dealt with employment as well as seniority. Mergers, sales of assets and absorptions are commonplace events. It is not unusual for collective bargaining agreements to deal with them, especially in the transportation industry where the same unions may represent the employees of both parties to the transaction.[9] Following any of such events, the business of the one company will probably include the former business of the other; and the recurring question is whether it is the employees of the absorbed company or those of the acquiring company who are to have first call upon the available work at the latter concern. Jobs, as well as seniority, are at stake; and it was to solve just such problems that § 5 was designed. Its interpretation should be commensurate with its purposes.

Seniority has become of overriding importance, and one of its major functions is to determine who gets or who

seniority in the event of an absorption. Reconciliation of these two provisions, going to the power of the committee under the contract, itself presented an issue ultimately for the court, not the committee, to decide. Our view of the scope and applicability of § 5, *infra*, renders an accommodation of these two sections unnecessary.

[9] See cases cited in footnote 10, *infra*.

keeps an available job. Here § 5 provided for resolving the seniority of not only those employees who are "absorbed," but all who were "affected" by the absorption. Certainly the transaction "affected" the E & L employees; and the seniority of these drivers, which the parties or the Joint Conference Committee could determine, was clearly seniority at Dealers, the company which had absorbed the E & L business. The parties very probably, therefore, intended the seniority granted an E & L employee at Dealers to carry the job with it, just as seniority usually would. If it did not and if Dealers unilaterally could determine whether to hire any E & L employee, it might decide to hire none, excluding E & L employees from any of the work which they had formerly done. Or if it did hire E & L employees to fill any additional jobs resulting from the absorption of the E & L business, it might select E & L employees for jobs without regard to length of service at E & L or it might insist on an agreement from the union to grant only such seniority as might suit the company. Section 5 would be effectively emasculated.

The power of the Joint Conference Committee over seniority gave it power over jobs. It was entitled under § 5 to integrate the seniority lists upon some rational basis, and its decision to integrate lists upon the basis of length of service at either company was neither unique nor arbitrary. On the contrary, it is a familiar and frequently equitable solution to the inevitably conflicting interests which arise in the wake of a merger or an absorption such as occurred here.[10] The Joint Conference Committee's

---

[10] See for example, *Kent* v. *Civil Aeronautics Board*, 204 F. 2d 263 (C. A. 2d Cir. 1953); *Keller* v. *Teamsters Local 249*, 43 CCH Labor Cases ¶ 17,119 (D. C. W. D. Pa. 1961); *Pratt* v. *Wilson Trucking Co.*, 214 Ga. 385, 104 S. E. 2d 915 (1958); *Walker* v. *Pennsylvania-Reading Seashore Lines*, 142 N. J. Eq. 588, 61 A. 2d 453 (1948); *In re Western Union Telegraph Co. and American Communications*

decision to dovetail seniority lists was a decision which § 5 empowered the committee to make.

Neither do we find adequate support in this record for the complaint's attack upon the integrity of the union and of the procedures which led to the decision. Although the union at first advised the Dealers drivers that they had nothing to worry about but later supported the E & L employees before the Joint Conference Committee, there is no substantial evidence of fraud, deceitful action or dishonest conduct. Priddy's early assurances to Dealers employees were not well founded, it is true; but Priddy was acting upon information then available to him, information received from the company which led him to think there was no trade or exchange involved, no "absorption" which might bring § 5 into play. Other sections of the contract, he thought, would protect the jobs of Moore and his fellow drivers.[11] Consistent with this view, he also advised E & L employees that the situation appeared unfavorable for them. However, when he learned of the pending acquisition by Dealers of E & L operating authority in Louisville and of the involvement of other locations in the transaction, he considered the matter to be one for the Joint Committee. Ultimately

*Association* (Decisions of War Labor Board 1944) 14 L. R. R. M. 1623. Cf. *Colbert* v. *Brotherhood of Railroad Trainmen,* 206 F. 2d 9 (C. A. 9th Cir. 1953); *Labor Board* v. *Wheland Co.,* 271 F. 2d 122 (C. A. 6th Cir. 1959); *Hardcastle* v. *Western Greyhound Lines,* 303 F. 2d 182 (C. A. 9th Cir. 1962); *Fagan* v. *Pennsylvania R. Co.,* 173 F. Supp. 465 (D. C. M. D. Pa. 1959). "Integration of seniority lists should ordinarily be accomplished on the basis of each employee's length of service with his original employer . . . ." Kahn, Seniority Problems in Business Mergers, 8 Industrial and Labor Relations Review 361, 378.

[11] The Dealers employees rely upon a rider to the Dealers contract protecting the seniority of the employees at a terminal when another terminal of that company is closed down. The court below did not believe the rider dispositive, and we agree.

he took the view that an absorption was involved, that § 5 did apply and that dovetailing seniority lists was the most equitable solution for all concerned. We find in this evidence insufficient proof of dishonesty or intentional misleading on the part of the union. And we do not understand the court below to have found otherwise.

The Kentucky court, however, made much of the antagonistic interests of the E & L and Dealers drivers, both groups being represented by the same union, whose president supported one group and opposed the other at the hearing before the Joint Conference Committee. But we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another. In *Ford Motor Co.* v. *Huffman,* 345 U. S. 330, the Court found no breach of duty by the union in agreeing to an amendment of an existing collective bargaining contract, granting enhanced seniority to a particular group of employees and resulting in layoffs which otherwise would not have occurred. "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Id.,* at 338. Just as a union must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. Nor should it be neutralized when the issue is chiefly between two sets of employees. Conflict between employees represented

by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes.

As far as this record shows, the union took its position honestly, in good faith and without hostility or arbitrary discrimination. After Dealers absorbed the Louisville business of E & L, there were fewer jobs at Dealers than there were Dealers and E & L drivers. One group or the other was going to suffer. If any E & L drivers were to be hired at Dealers either they or the Dealers drivers would not have the seniority which they had previously enjoyed. Inevitably the absorption would hurt someone. By choosing to integrate seniority lists based upon length of service at either company, the union acted upon wholly relevant considerations, not upon capricious or arbitrary factors. The evidence shows no breach by the union of its duty of fair representation.

There is a remaining contention. Even though the union acted in good faith and was entitled to take the position it did, were the Dealers employees, if the union was going to oppose them, deprived of a fair hearing by having inadequate representation at the hearing? Dealers employees had notice of the hearing; they were obviously aware that they were locked in a struggle for jobs and seniority with the E & L drivers, and three stewards representing them went to the hearing at union expense and were given every opportunity to state their position. Thus the issue is in reality a narrow one. There was no substantial dispute about the facts concerning the nature of the transaction between the two companies. It was for the Joint Conference Committee initially to decide whether there was an "absorption" within the meaning of § 5 and, if so, whether seniority lists were to be integrated and the older employees of E & L given jobs at Dealers. The Dealers employees made no request to continue the hearing until they could secure further representation and have not yet suggested what they could

have added to the hearing by way of facts or theory if they had been differently represented. The trial court found it "idle speculation to assume that the result would have been different had the matter been differently presented." We agree.

Moore has not, therefore, proved his case. Neither the parties nor the Joint Committee exceeded their power under the contract and there was no fraud or breach of duty by the exclusive bargaining agent. The decision of the committee, reached after proceedings adequate under the agreement, is final and binding upon the parties, just as the contract says it is. *Drivers Union* v. *Riss & Co.,* 372 U. S. 517.

The decision below is reversed and the cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS.

I agree for the reasons stated by my Brother GOLDBERG that this litigation was properly brought in the state court but on the merits I believe that no cause of action has been made out for the reasons stated by the Court.

MR. JUSTICE GOLDBERG, with whom MR. JUSTICE BRENNAN joins, concurring in the result.

I concur in the judgment and in the holding of the Court that since "Moore has not . . . proved his case . . . ," the decision below must be reversed. *Supra.* I do not, however, agree that Moore stated a cause of action arising under § 301 (a) of the Labor Management Relations Act, 61 Stat. 156, 29 U. S. C. § 185 (a). It is my view rather that Moore's claim must be treated as an individual employee's action for a union's breach of its duty of fair representation—a duty derived not from the collective bargaining contract but from the National Labor Relations Act, as amended, 61 Stat. 136, 29 U. S. C. § 141

*et seq.* See *Syres* v. *Oil Workers Int'l Union,* 350 U. S. 892, reversing 223 F. 2d 739; *Brotherhood of Railroad Trainmen* v. *Howard,* 343 U. S. 768; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen,* 323 U. S. 210; *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192. Cf. *International Association of Machinists* v. *Central Airlines, Inc.,* 372 U. S. 682.

The complaint does not expressly refer either to § 301 (a) of the Labor Management Relations Act or to the National Labor Relations Act as the source of the action. Since substance and not form must govern, however, we look to the allegations of the complaint and to the federal labor statutes to determine the nature of the claim.

The opinion of the Court correctly describes Moore's complaint as alleging that the decision of the Joint Conference Committee dovetailing the seniority lists of the two companies violated Moore's rights because: (1) the Joint Committee exceeded its powers under the existing collective bargaining contract in making its decision dovetailing seniority lists, and (2) the decision of the Committee was brought about by dishonest union conduct in breach of its duty of fair representation.

Neither ground, it seems to me, sustains an action under § 301 (a) of the L. M. R. A. A mutually acceptable grievance settlement between an employer and a union, which is what the decision of the Joint Committee was, cannot be challenged by an individual dissenting employee under § 301 (a) on the ground that the parties exceeded their contractual powers in making the settlement. It is true that this Court, in a series of decisions dealing with labor arbitrations, has recognized that the powers of an arbitrator arise from and are defined by the collective bargaining agreement.[1] "For arbitration," as the

---

[1] *E. g., United Steelworkers of America* v. *American Manufacturing Co.,* 363 U. S. 564; *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.,* 363 U. S. 574; *United Steelworkers of America* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593.

Court said in *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 582, "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Thus the existing labor contract is the touchstone of an arbitrator's powers. But the power of the union and the employer jointly to settle a grievance dispute is not so limited. The parties are free by joint action to modify, amend, and supplement their original collective bargaining agreement. They are equally free, since "[t]he grievance procedure is . . . a part of the continuous collective bargaining process," to settle grievances not falling within the scope of the contract. *Id.*, at 581. In this case, for example, had the dispute gone to arbitration, the arbitrator would have been bound to apply the existing agreement and to determine whether the merger-absorption clause applied. However, even in the absence of such a clause, the contracting parties—the multiemployer unit [2] and the union—were free to resolve the dispute by amending the contract to dovetail seniority lists or to achieve the same result by entering into a grievance settlement. The presence of the merger-absorption clause did not restrict the right of the parties to resolve their dispute by joint agreement applying, interpreting, or amending the contract.[3] There are too many unforeseeable

---

[2] The Court states that "In its brief filed here Dealers does not support the decision of the Joint Committee." See *ante*, at 343, n. 3. The Court overlooks, however, that Dealers throughout the litigation has acknowledged that it is a part of the multiemployer unit, which is the employer party to the collective bargaining agreement and that the employer representatives on the Joint Conference Committee acted honestly and properly on behalf of the employer members including Dealers. See *infra*, at 357.

[3] The contract in this case specifically envisioned such a result. Section 5 of Article 4 provided that:

"In the event that the Employer absorbs the business of another private, contract or common carrier, or is a party to a merger of lines, the seniority of the employees absorbed or affected thereby

contingencies in a collective bargaining relationship to justify making the words of the contract the exclusive source of rights and duties.

These principles were applied in *Ford Motor Co.* v. *Huffman,* 345 U. S. 330. There the union and the employer during a collective bargaining agreement entered into a "supplementary agreement" providing seniority credit for the pre-employment military service of veterans, a type of seniority credit not granted in the original agreement. *Id.,* at 334, n. 6. Huffman, on behalf of himself and other union members whose seniority was adversely affected, brought suit to have the supplementary provisions declared invalid and to obtain appropriate injunctive relief against the employer and the union. There was no doubt that Huffman and members of his class were injured as a result of the "supplementary agreement"; they were subjected to layoffs that would not have affected them if the seniority rankings had not been altered. Despite the change in rights under the prior agreement, this Court held that the existing labor agreement did not limit the power of the parties jointly, in the process of bargaining collectively, to make new and

shall be determined by mutual agreement between the Employer and the Unions involved. Any controversy with respect to such matter shall be submitted to the joint grievance procedure . . . ."

Section 2 of Article 7 also provided that:

"(d) It is agreed that all matters pertaining to the interpretation of any provision of this Agreement, whether requested by the Employer or the Union, must be submitted to the full Committee of the Automobile Transporters Joint Conference Committee, which Committee, after listening to testimony on both sides, shall make a decision."

Moreover, as the Court itself points out, other provisions stated that it was "the intention of the parties to resolve all questions of interpretation by mutual agreement" and that the employer agreed "to be bound by all of the terms and provisions of this Agreement, and also agrees to be bound by the interpretations and enforcement of the Agreement." *Ante,* at 339.

different contractual arrangements affecting seniority rights.

It necessarily follows from *Huffman* that a settlement of a seniority dispute, deemed by the parties to be an interpretation of their agreement, not requiring an amendment, is plainly within their joint authority. Just as under the *Huffman* decision an amendment is not to be tested by whether it is within the existing contract, so a grievance settlement should not be tested by whether a court could agree with the parties' interpretation. If collective bargaining is to remain a flexible process, the power to amend by agreement and the power to interpret by agreement must be coequal.

It is wholly inconsistent with this Court's recognition that "[t]he grievance procedure is . . . a part of the continuous collective bargaining process," *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U. S., at 581, to limit the parties' power to settle grievances to the confines of the existing labor agreement, or to assert, as the Court now does, that an individual employee can claim that the collective bargaining contract is violated because the parties have made a grievance settlement going beyond the strict terms of the existing contract.

I turn now to the second basis of the complaint, *viz.*, that the decision of the Joint Conference Committee was brought about by dishonest union conduct in breach of its duty of fair representation. In my view, such a claim of breach of the union's duty of fair representation cannot properly be treated as a claim of breach of the collective bargaining contract supporting an action under § 301 (a). This is particularly apparent where, as here, "[n]o fraud is charged against the employer . . . ." *Ante,* at 343.

This does not mean that an individual employee is without a remedy for a union's breach of its duty of fair representation. I read the decisions of this Court to hold that

an individual employee has a right to a remedy against a union breaching its duty of fair representation—a duty derived not from the collective bargaining contract but implied from the union's rights and responsibilities conferred by federal labor statutes. See *Syres* v. *Oil Workers Int'l Union, supra* (National Labor Relations Act); *Brotherhood of Railroad Trainmen* v. *Howard, supra* (Railway Labor Act); *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen, supra* (Railway Labor Act); *Steele* v. *Louisville & N. R. Co., supra* (Railway Labor Act). Cf. *International Association of Machinists* v. *Central Airlines, Inc., supra* (Railway Labor Act). There is nothing to the contrary in *Smith* v. *Evening News Assn.,* 371 U. S. 195. In that case the gravamen of the individual employee's § 301 (a) action was the employer's discharge of employees in violation of the express terms of the collective bargaining agreement. No breach of the union's duty of fair representation was charged. To the contrary, the union supported the employee's suit which was brought as an individual suit out of obeisance to what the union deemed to be the requirements of *Association of Westinghouse Salaried Employees* v. *Westinghouse Electric Corp.,* 348 U. S. 437.

The remedy in a suit based upon a breach of the union's duty of fair representation may be extended to the employer under appropriate circumstances. This was recognized in *Steele* v. *Louisville & N. R. Co., supra,* where the Court extended the remedy against the union to include injunctive relief against a contract between the employer and the union. There the employer willfully participated in the union's breach of its duty of fair representation and that breach arose from discrimination based on race, a classification that was held "irrelevant" to a union's statutory bargaining powers. The Court observed:

"[I]t is enough for present purposes to say that the statutory power to represent a craft and to make con-

tracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on . . . relevant differences." *Id.,* at 203.

The Court distinguished classifications and differences which are "relevant to the authorized purposes of the contract . . . such as differences in seniority, the type of work performed, [and] the competence and skill with which it is performed, . . ." *Ibid.* Where the alleged breach of a union's duty involves a differentiation based on a relevant classification—in this case seniority rankings following an amalgamation of employer units—and where the employer has not willfully participated in the alleged breach of the union's duty, the collective bargaining agreement should not be open to the collateral attack of an individual employee merely because the union alone has failed in its duty of fair representation. We should not and, indeed, we need not strain, therefore, as the Court does, to convert a breach of the union's duty to individual employees into a breach of the collective bargaining agreement between the employer and the union.

I do not agree with the Court that employer willfulness was claimed in this case by "[t]he fair inference from the complaint" that Dealers "considered the dispute a matter for the union to decide." *Ante,* at 343. Nor can I agree that willfulness could be predicated on the rationale that since "the award had not been implemented at the time of the filing of the complaint," Dealers was "put . . . on notice that the union was charged with dishonesty and a breach of duty in procuring the decision of the Joint Committee." *Ibid.* Dealers may indeed have been neutral when the case was presented to the Joint Conference Committee but the Court overlooks that the employer-party to the collective bargaining contract was the multiemployer unit whose representatives—acting on behalf of both Dealers and E & L—fully participated in the Joint Com-

mittee's decision resolving the dispute.[4]   Furthermore, an employer not willfully participating in union misconduct should not be restrained from putting a grievance settlement into effect merely by being "put . . . on notice" that an individual employee has charged the union with dishonesty.   Such a rule would penalize the honest employer and encourage groundless charges frustrating joint grievance settlements.   Finally, it is difficult to conceive how mere notice to an employer of union dishonesty can transform the union's breach of its duty of fair representation into a contractual violation by the employer.

In summary, then, for the reasons stated, I would treat Moore's claim as a *Syres-Steele* type cause of action rather than as a § 301 (a) contract action.   So considering it, I nevertheless conclude, as the Court does, that since "there was no fraud or breach of duty by the exclusive bargaining agent," *ante,* at 351, Moore is not entitled to the relief sought.

I have written at some length on what may seem a narrow point.   I have done so because of my conviction that in this Court's fashioning of a federal law of collective bargaining, it is of the utmost importance that the law reflect the realities of industrial life and the nature of the collective bargaining process.   We should not assume that doctrines evolved in other contexts will be equally well adapted to the collective bargaining process.   Of course, we must protect the rights of the individual.   It must not be forgotten, however, that many individual rights, such as the seniority rights involved in this case, in fact arise from the concerted exercise of the right to bargain collectively.   Consequently, the understandable desire to protect the individual should not emasculate the right to bargain by placing undue restraints upon the contracting parties.   Similarly, in safeguarding the individ-

---

[4] See note 2, *supra.*

ual against the misconduct of the bargaining agent, we must recognize that the employer's interests are inevitably involved whenever the labor contract is set aside in order to vindicate the individual's right against the union. The employer's interest should not be lightly denied where there are other remedies available to insure that a union will respect the rights of its constituents. Nor should trial-type hearing standards or conceptions of vested contractual rights be applied so as to hinder the employer and the union in their joint endeavor to adapt the collective bargaining relationship to the exigencies of economic life. I have deemed it necessary to state my views separately because I believe that the Court's analysis in part runs contrary to these principles.

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

I agree with the Court's opinion and judgment insofar as it relates to the claim that the Joint Conference Committee exceeded its authority under the collective bargaining agreement. Although it is undoubtedly true as a general proposition that bargaining representatives have power to alter the terms of a contract with an employer, the challenge here is not to a purported exercise of such power but to the validity of a grievance settlement reached under proceedings allegedly not authorized by the terms of the collective agreement. Moreover, a committee with authority to settle grievances whose composition is different from that in the multiunion-multiemployer bargaining unit cannot be deemed to possess power to effect changes in the bargaining agreement. When it is alleged that the union itself has engaged or acquiesced in such a departure from the collective bargaining agreement, I can see no reason why an individually affected employee may not step into the shoes of the union and maintain a § 301 suit himself.

But insofar as petitioners' claim rests upon alleged unfair union representation in the grievance proceeding, I agree with the views expressed in the concurring opinion of my Brother GOLDBERG (*ante,* 355–358) (except that I would expressly reserve the question of whether a suit of this nature would be maintainable under § 301 where it is alleged or proved that the employer was a party to the asserted unfair union representation). However, the conclusion that unilateral unfair union representation gives rise only to a cause of action for violation of a duty implicit in the National Labor Relations Act brings one face-to-face with a further question: Does such a federal cause of action come within the play of the preemption doctrine, *San Diego Trades Council* v. *Garmon,* 359 U. S. 236, contrary to what would be the case were such a suit to lie under § 301, *Smith* v. *Evening News Assn.,* 371 U. S. 195? Short of deciding that question, I do not think it would be appropriate to dispose of this case simply by saying that no unfair union representation was shown in this instance. For if there be preemption in this situation, *Garmon* would not only preclude state court jurisdiction but would also require this Court initially to defer to the primary jurisdiction of the Labor Board.

The preemption issue is a difficult and important one, carrying ramifications extending far beyond this particular case. It should not be decided without our having the benefit of the views of those charged with the administration of the labor laws. To that end I would reverse the judgment of the state court to the extent that it rests upon a holding that the Joint Conference Committee acted beyond the scope of its authority, set the case for reargument on the unfair representation issue, and invite the National Labor Relations Board to present its views by brief and oral argument on the preemption question. Cf. *Retail Clerks International Assn.* v. *Schermerhorn,* 373 U. S. 746, 757; 375 U. S. 96.